IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No. |
| | ) | 16-00138-01-CR-W-GAF |
| DARRELL L. GIVENS, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION TO DENY
DEFENDANT'S MOTIONS TO SUPPRESS EVIDENCE**

Before the court are defendant's motions to suppress the indictment (document numbers 39 and 47), which are interpreted as motions to suppress evidence (a firearm, a vial of PCP, and cash) and defendant's subsequent statement.

*I.     BACKGROUND*

On March 31, 2016, Officers Garrett Lynch and Kenneth Lightner were sent to 4055 Oakley Avenue to investigate a disturbance. They parked their vehicle at the front of the house; and as they were walking toward the house, they heard screams coming from inside. A woman, Sonya Wiggins, was inside the house; and when she saw the officers at the front door, she yelled, "He's trying to hide his gun! He's trying to hide his gun in the sink!" Officer Lightner was entering the house and heard the sound of a solid metal object hit another metal object. He saw defendant in the kitchen near the sink. Defendant was the only person in the kitchen. Defendant walked into the living room and said he did not have a gun. Officer Lightner went into the kitchen, looked in the sink, and saw a red bowl flipped over. Officer Lightner lifted up the bowl and saw a Jimenez .380 caliber pistol which he seized. He contacted the robbery unit and learned

that defendant was a convicted felon, so he arrested defendant for being a felon in possession of a firearm. Defendant was searched incident to arrest and officers found a vial of PCP in his pants pocket and a total of $6,999 cash in his pockets.

An indictment was returned on April 20, 2016, charging possession of PCP with intent to distribute, possession of a firearm in furtherance of a drug trafficking crime, and possession of a firearm by a convicted felon, with the enhanced penalty provision of 18 U.S.C. § 924(e).

On September 28, 2016, defendant's request to proceed pro se was granted. He filed multiple pretrial motions including the instant motions to suppress. Defendant argues that the fact that several minutes of the body cam were muted violated his Fifth Amendment rights as well as the entire-controversy doctrine, the officers' reliance on their badges under color of law amounts to cruel and unusual punishment, Officer Lightner's moving of the bowel violated the plain view doctrine, and seizure of the gun was unconstitutional because there was no warrant and no consent to search the residence.

On October 24, 2016, the government filed a response in opposition to defendant's motions (document number 54), arguing that Officer Lightner's looking in the sink and moving the bowel to discover the gun was lawful pursuant to the community caretaking function which permits police to help those in danger.

I held a hearing on November 7, 2016. The United States was represented by Assistant United States Attorney Mike Green. Defendant was present acting pro se.

2

The following witnesses testified:

1. Officer Kenneth Lightner, Kansas City, Missouri, Police Department
2. Detective Eric DeValkenaere
3. Defendant Darrell Givens

The following exhibits were admitted into evidence:

P. Ex. 1   Dash camera video

P. Ex. 2   Video of interview between defendant and Detective DeValkenaere

P. Ex. 3   <u>Miranda</u> waiver form signed by defendant

P. Ex. 4   Photo of living room and dining room of residence

P. Ex. 5   Photo of handgun found in the sink and the cash and PCP found on defendant's person

P. Ex. 6   Photograph of money

D. Ex. 1   Portion of police report (included as attachment to document number 39)

D. Ex. 2   Portion of police report (included as attachment to document number 47)

A transcript of the hearing was filed on November 10, 2016 (document numbers 61, 62).

## II. EVIDENCE

On the basis of the evidence presented at the suppression hearing, I submit the following findings of fact:

1. On March 31, 2016, Officers Ken Lightner and Garrett Lynch were dispatched to 4055 Oakley Avenue around 6:00 p.m. on a disturbance call (Tr. at 5-6).[1] Although Officer Lightner was wearing a body recorder, on this day the microphone was

---

[1] "Tr." refers to document number 61.

turned off at first (Tr. at 7-8). The microphone is on the front of his belt directly under the bottom of his vest (Tr. at 8). There is a mute button on top of the microphone which had been inadvertently pushed by Officer Lightner's vest when he bent to get out of his car (Tr. at 8). Officer Lightner did not know that his body camera microphone became muted as he stepped out of his car after arriving at 4055 Oakley (Tr. at 8, 10).

      2.      The officers pulled up to the residence at 5:58 p.m. (Tr. at 9; P. Ex. 1). There was a front screen door which was closed and the main front door behind that was open (Tr. at 11). As the officers walked toward the residence, they could hearing screaming (loud arguing) from inside (Tr. at 11, 24). As the officers approached the front door, the woman who had called police noticed the officers and began waving for them to come in, actively screaming saying that someone inside had a gun and was putting it in the sink (Tr. at 11, 25, 36-37).

      3.      The officers entered the residence and Officer Lightner heard a loud "thud" which sounded like a metal object being dropped into a metal sink (Tr. at 11, 14, 25, 36-37, 40). The woman, later identified as Sonya Wiggins, was standing in the dining room near the kitchen, and other people were in the living room and hallway area (Tr. at 11, 12, 33-34). There was a table in the dining room area, and it had chairs stacked on top of it (Tr. at 23; P. Ex. 4). The woman was pointing directly into the kitchen screaming, "He has a gun, he's putting it in the sink!" (Tr. at 11, 13, 14, 25, 40).

      4.      Defendant walked out of the kitchen into the living room area where the officers were located, and defendant said he did not have a gun (Tr. at 11-12, 13-14, 26, 39). Officer Lightner immediately went into the kitchen to see if there was a gun because there were other people in the house (Tr. at 14-15, 16, 39). There was no one

4

else in the kitchen (Tr. at 16, 39). He saw the sink, and he saw an upside down bowl in the sink (Tr. at 15). He lifted the bowl up and saw a handgun lying in the sink underneath the bowl (Tr. at 15, 34, 39).

5. At that point, defendant was detained and handcuffed, and the gun was taken outside and made safe (Tr. at 15, 16). It contained a loaded magazine (Tr. at 15-16). Defendant was detained until detectives could be called and the complaining party could be interviewed (Tr. at 16).

6. The robbery unit was contacted to see if defendant was a convicted felon (Tr. at 16). Officer Lightner was informed that defendant was indeed a convicted felon; therefore, he was placed under arrest for possession of the firearm (Tr. at 17, 18). He was taken out of the house and searched (Tr. at 17, 18).

7. Defendant was wearing sweat pants with two front pockets, two back pockets, and a cargo pocket by each knee (Tr. at 19). Officer Lynch observed a very large amount of cash in defendant's pockets -- the cash was found in every pocket (Tr. at 18-19). In defendant's right cargo pocket officers found a glass jar with a brownish lighter-colored liquid, and it had tobacco flakes floating around in the bottom (Tr. at 19). When Officer Lightner pulled the jar out of the pocket, defendant said that it was perfume (Tr. at 19). Officer Lightner could smell the contents of the jar without opening it (Tr. at 28). Based on his training and experience, Officer Lightner believed it to be PCP (Tr. at 19).

8. After defendant was placed under arrest, Officer Lightner talked to Ms. Wiggins about what had happened (Tr. at 37-38). This occurred outside the residence about ten minutes after officers had arrived (Tr. at 38). Ms. Wiggins said she had

5

called the police because she wanted defendant to leave -- he was in a fight with Ms. Wiggins's son (Tr. at 41). Officer Lightner asked Ms. Wiggins if anyone in the house owns a gun, and she said, "no" (Tr. at 42-43). Ms. Wiggins told police that 4055 Oakley was her residence (Tr. at 52).

9. Defendant was then taken to the police station (Tr. at 20). The money was taken to Asset Forfeiture (Tr. at 20). Sergeant Garza, Officer Lynch and Officer Lightner counted the cash a few times and got the same amount each time -- $6,999 (Tr. at 20). Asset Forfeiture has a money counter which they are required to use three times, and all three times the money counter reported $6,999 (Tr. at 20). Defendant had 249 $1 bills, 38 $100 bills, 32 $5 bills, 30 $10 bills, 92 $20 bills, and 13 $50 bills (Tr. at 21).

10. Detective DeValkenaere met with defendant in an interview room and advised him of his Miranda rights (Tr. at 54-55). Defendant signed a Miranda waiver form (Tr. at 55; P. Ex. 3). The detective then obtained personal information from defendant (Tr. at 54-55). During the interview, defendant admitted that the vial taken from his pants pocket contained PCP (Tr. at 56). Defendant said he purchases a bottle of PCP a week, which, according to Detective DeValkenaere, is a large quantity (Tr. at 56). Detective DeValkenaere asked defendant where he was getting his PCP, and defendant responded, "No, we're not getting into that right now." (Tr. at 56; P. Ex. 2). Defendant did not ask to stop the interview; he did not ask for an attorney (Tr. at 57; P. Ex. 2).

11. During the interview defendant admitted to having touched the gun after Detective DeValkenaere asked if defendant's DNA would be found on the gun (Tr. at

6

58, 60). Detective DeValkenaere asked defendant to describe how he touched it; he said he found it in the house, took it towards Mr. Wiggins, and motioned like, "hey, what is this, you need to get this out of here" (Tr. at 58).

      12.     Sometime after defendant was charged and had an attorney representing him, his attorney showed defendant a photograph of the recovered gun (Tr. at 68). Defendant testified that he told Mr. Marquart that he had never seen the gun in that photo before (Tr. at 68-69). The gun defendant thought he and Detective DeValkenaere had been talking about during the interview was not the gun in the picture (Tr. at 69).

      13.     Defendant testified that when the police arrived at the residence, they threatened to blow his head off if he moved; and as an officer ran past defendant, he told the officer that he could not search defendant's house (Tr. at 69, 70).

### *III.* *BODY RECORDER*

Defendant argues that it was a violation of Department of Justice and Kansas City Police Department protocol not to use the body recorder during the entire incident (referring to the 10 to 12 minutes that are missing on the recording) and this violates his Fifth Amendment rights.

Violation of Department of Justice or Kansas City Police Department protocol does not create any rights on behalf of a criminal defendant. See United States v. Kubini, 19 F. Supp. 3d 579, 619 (W.D. Pa. 2014) (provisions in U.S. Attorney's Manual do not create enforceable rights); United States v. Gomez, 237 F.3d 238, n.1 (3rd Cir. 2000) (provisions of U.S. Attorney's Manual do not create any judicially enforceable rights); United States v. Jarrett, 447 F.3d 520, 529 (7th Cir. 2006) (case law, not internal

handbooks, provides the guidance for whether rights have been violated); <u>United States v. Gross</u>, 41 F.Supp.2d 1096, 1098 (C.D. Cal. 1999) aff'd 40 Fed. Appx. 397 (9th Cir. 2002) (US Attorney's Manual did not create enforceable rights).

Officer Lightner testified that his body microphone was accidentally muted when his vest pushed the mute button as he was getting out of his patrol car. This did not violate any of defendant's rights.

## IV. ENTIRE CONTROVERSY DOCTRINE

Defendant argues that the missing audio on the body recorder violates the entire controversy doctrine. The "entire controversy doctrine" cited by defendant is not relevant. The entire controversy doctrine is a res judicata type doctrine that applies to civil lawsuits and appears to exist only in New Jersey state court.

## V. CRUEL AND UNUSUAL PUNISHMENT

Defendant's argument that the officers' reliance on their badges under color of law in using incomplete written testimony amounts to cruel and unusual punishment is meritless. First, it is unclear what defendant means by the incompleteness of Officer Lightner's written testimony. Second, nothing defendant refers to constitutes "punishment."

> The exact scope of the constitutional phrase "cruel and unusual" has not been detailed by this Court. But the basic policy reflected in these words is firmly established in the Anglo-American tradition of criminal justice. The phrase in our Constitution was taken directly from the English Declaration of Rights of 1688, and the principle it represents can be traced back to the Magna Carta. The basic concept underlying the Eighth Amendment is nothing less than the dignity of man. While the State has the power to punish, the Amendment stands to assure that this power be exercised within the limits of civilized standards. Fines, imprisonment and even execution may be imposed depending upon the enormity of the crime, but any technique outside the bounds of these traditional penalties

8

Case 4:16-cr-00138-BP   Document 71   Filed 11/18/16   Page 8 of 13

is constitutionally suspect. This Court has had little occasion to give precise content to the Eighth Amendment, and, in an enlightened democracy such as ours, this is not surprising. But when the Court was confronted with a punishment of 12 years in irons at hard and painful labor imposed for the crime of falsifying public records, it did not hesitate to declare that the penalty was cruel in its excessiveness and unusual in its character. Weems v. United States, 217 U.S. 349. The Court recognized in that case that the words of the Amendment are not precise, and that their scope is not static. The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.

Trop v. Dulles, 356 U.S. 86, 99-101 (1958).

Any potential punishment in this case is limited to imprisonment and fine, which does not constitute cruel and unusual punishment.

## *VI.* *PLAIN VIEW DOCTRINE*

Defendant argues that Officer Lightner's moving the bowl to find the gun violated the plain view doctrine. Because the government does not rely on the plain view doctrine to support the seizure of the gun, this argument is irrelevant.

## *VII.* *COMMUNITY CARETAKING FUNCTION*

Defendant argues that the seizure of the gun was illegal because police had neither a warrant nor consent to search.

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." A warrant signed by a judge ensures that a search is reasonable. Maryland v. Dyson, 527 U.S. 465, 466 (1999). The Supreme Court has outlined multiple exceptions to the warrant requirement, one being the community caretaking function of the police. Cady v. Dombrowski, 413 U.S. 433, 441 (1973).

9

> Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.

In Cady v. Dombrowski, a police officer crashed his car while driving drunk. Because he was required to carry a firearm at all times and no firearm had been found on his person, officers searched his car including the locked trunk looking for the firearm. They discovered evidence of a murder in the trunk. The Court held that the search was lawful due to the community caretaking function of the police.

In United States v. Harris, 747 F.3d 1013, 1017 (8th Cir. 2014), the court held that a search or seizure of a person by a police officer acting in the officer's noninvestigatory capacity is reasonable if the governmental interest in the police officer's exercise of the officer's community caretaking function, based on specific articulable facts, outweighs the individual's interest in being free from arbitrary government interference. Samuelson v. City of New Ulm, 455 F.3d 871, 877 (8th Cir. 2006) (quoting Winters v. Adams, 254 F.3d 758, 767 (8th Cir. 2001) (Bye, J., concurring)); accord United States v. Garner, 416 F.3d 1208, 1213 (10th Cir. 2005). The scope of the encounter must be carefully tailored to satisfy the purpose of the initial detention, and the police must allow the person to proceed once the officer has completed the officer's inquiry, unless, of course, the officer obtains further reason to justify the stop. See United States v. Garner, 416 F.3d 1208, 1213 (10th Cir. 2005); see also United States v. Morgan, 729 F.3d 1086, 1091 (8th Cir. 2013) (While officers should employ the least intrusive means reasonably available to verify or dispel their suspicions, they may take any additional steps that are reasonably necessary to protect

their personal safety during the course of the stop (quoting United States v. Hensley, 469 U.S. 221, 235 (1985)).

The community caretaking function permits police to enter a residence without a warrant if the officer has a reasonable belief that an emergency exists requiring his or her attention. Mincey v. Arizona, 437 U.S. 385, 392-393 (1978); United States v. Quezada, 448 F.3d 1005, 1007 (8th Cir. 2006); United States v. Nord, 586 F.2d 1288, 1291 n.5 (8th Cir. 1978). "Reasonable belief," the standard used when determining whether an officer may enter as a community caretaker, is a less exacting standard than probable cause. Mincey v. Arizona, 437 U.S. at 392-393; Maryland v. Buie, 494 U.S. 325, 336-337 (1990). This standard was discussed by the Eighth Circuit Court of Appeals in United States v. Quezada, 448 F.3d 1005 (8th Cir. 2006):

> This has led to some concern that a police officer might use his or her caretaking responsibilities as a pretext for entering a residence. The Ninth Circuit, therefore, has held that to justify an entry like the one in the present case an officer must have actually believed that an emergency existed and the belief must have primarily motivated his or her actions. See United States v. Cervantes, 219 F.3d 882, 890 (9th Cir. 2000), cert. denied, 532 U.S. 912 (2001). This is contrary to the principle applicable when an entry is justified by probable cause to believe that a violation of law has occurred or is occurring; in those situations, the subjective intent of the officer is immaterial, see Whren v. United States, 517 U.S. 806, 813 (1996).

United States v. Quezada, 448 F.3d at 1007-1008.

When there is ample evidence in the record that the officer entered the residence to investigate a possible emergency situation, then the Fourth Amendment is violated only if no reasonable officer could have believed that an emergency was at hand, and the legal relevancy of the officer's subject intent is no longer relevant. Id. at 1008.

11

Here, the uncontroverted evidence is that the officers were called to the residence on a disturbance; when they arrived they heard loud arguing coming from within the residence; when Sonya Wiggins saw them approaching the residence, she began waving for them to come in; Ms. Wiggins yelled that someone had a gun; when the officers entered the residence, they heard a metal clinking sound which they believed to be the sound of a gun being dropped into a metal sink; Ms. Wiggins was yelling that he had a gun and was trying to hide it in the sink; there were other people present besides defendant and Ms. Wiggins; and the officers did not yet know the circumstances of the disturbance which prompted the call for help to the police other than hearing loud arguing and a female screaming that a male had a gun. I find that a reasonable officer would have believed that an emergency was at hand. Therefore, the entry into the residence was lawful, and the search of the sink for the gun was lawful pursuant to the community caretaking function of the police.

Defendant testified that the officers were on their knees with weapons drawn and that they threatened to blow defendant's head off. Officer Lightner's testimony contradicted defendant's. Law enforcement may not use threats, physical intimidation or punishment to obtain consent. United States v. Golinveaux, 611 F.3d 956, 959 (8th Cir. 2010). In this case, however, the government does not allege that defendant consented to a search of any part of the residence. Therefore, any potential threats or intimidation is irrelevant to the issue before me and I find no need to address the conflicting testimony on this point.

Finally, although defendant does not argue in his motions that he refused to give consent to search the house, he testified that he told the officers they could not search

12

the house and cites Georgia v. Randolph, 547 U.S. 103 (2006), for the proposition that refusal by a physically present occupant to permit a warrantless house search which was consented to by another occupant invalidates the search as to the occupant who refused. Because the officers' entry into the house and search of the sink to find the gun is not based on anyone's consent, this argument is irrelevant.

## *VIII.* **CONCLUSION**

Based on all of the above, I find that the officers' entry into the residence and search of the sink was done pursuant to the community caretaking function of the police. Because there was no constitutional violation leading to the discovery of the gun, there is no fruit of the poisonous tree and therefore no basis to suppress the cash, the PCP or defendant's statement.

It is

RECOMMENDED that the court, after making an independent review of the record and the applicable law, enter an order denying both defendant's motions to suppress.

Government counsel and the defendant are advised that, pursuant to 28 U.S.C. § 636(b)(1), specific objections must be filed and served no later than December 2, 2016.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
November 18, 2016